In the Supreme Court of Georgia

Decided:    September 24, 2018

S18A0627.  FELTON v. THE STATE.

BENHAM, Justice.

Appellant Johnathan Felton appeals his convictions related to the shooting death of Eric Wright.[1]  As error, appellant alleges the trial court improperly commented on the evidence in violation of former OCGA § 17-8-57.  For the reasons set forth herein, we affirm his convictions.

The evidence viewed in a light most favorable to supporting the jury's verdicts shows as follows.  On the night of October 25, 2010, police responded to a report of shots fired at a car wash located at 2583 Tobacco Road in

---

[1] The crimes occurred on October 25, 2010.  On December 20, 2011, a Richmond County grand jury indicted appellant on charges of malice murder, felony murder (aggravated assault), possession of a firearm during the commission of a crime, and possession of a firearm by a first offender probationer.  Appellant was tried before a jury from April 21-24, 2014, with the jury returning verdicts of guilty on all charges.  On April 24, 2014, the trial court sentenced appellant to serve life in prison without parole for malice murder, five years to serve consecutively for possession of a firearm during the commission of a crime, and five years to serve consecutively for possession of a firearm by a first offender probationer.  The charge of felony murder was vacated as a matter of law.  Appellant filed a motion for new trial on May 13, 2014, and amended it on October 28, 2016, and on February 10, 2017.  On March 3, 2017, the trial court held a hearing on the motion for new trial as amended and denied it on May 22, 2017.  Appellant filed a notice of appeal on May 30, 2017.  Upon receipt of the trial record, the case was docketed to the April 2018 term of this Court and submitted for a decision to be made on the briefs.

Richmond County.  Given the late hour of that Sunday night, the car wash was empty and the surrounding businesses were closed.  The first officer to the scene testified that the victim was unresponsive and lying on his back, bleeding from gunshot wounds.

The victim's girlfriend, who was the only eyewitness to the crime, testified she and the victim had driven to that location in order for the victim to meet someone to purchase an audio component for his car.  She testified that a man was already at the car wash when she and the victim arrived.  A small, four-door red vehicle that had a black woman in the driver's seat was parked nearby.  The girlfriend testified she waited in the car while the victim got out and spoke with the man.  She stated she could not hear their conversation because the car engine was running, but she could see the two men and the man was faced towards her in front of the victim's vehicle.  The girlfriend testified she saw the man pull out a gun and shoot the victim several times. She testified the victim raised his arms and tried to back away from the man before collapsing.  Once the victim fell, the man fled from the scene in the red car. The victim's girlfriend called 911 and described the shooter as a black male wearing a black t-shirt and dark pants with short twists in his hair.  The police put out a bulletin alert for the red car and its occupants and ran database

searches based on a partial license plate number, but were not able to make any progress in the case with those leads.

The lead investigator testified that police retrieved the victim's cell phone from the scene and went through the telephone numbers in that phone to cultivate leads, homing in on the phone numbers that appeared close in time to the shooting. The lead investigator testified that whenever police identified a person of interest from the phone numbers, one of the investigators working the case presented a photographic lineup including that individual's photograph to the victim's girlfriend. For example, the photograph of C.J., who was a friend of the victim, was placed in a lineup because he had called the victim, but the victim's girlfriend did not identify him as the shooter. In addition, the police received an anonymous tip that K.H. and L.C. were seen with a .380 caliber weapon in the area a week prior to the shooting. They also received an anonymous tip concerning H.P. Police placed the photograph of each of these men in a photographic lineup and presented the lineups to the victim's girlfriend, but she did not identify any of them as the shooter. Police presented approximately six photographic lineups to the victim's girlfriend.

One of the phone numbers that appeared in the victim's cell phone close in time to the shooting belonged to D.J.[2] Police put D.J.'s picture in a photographic lineup, but the victim's girlfriend did not identify him as the shooter. However, when police spoke to D.J., he told them his phone had been stolen; therefore, police subpoenaed the records associated with D.J.'s phone. When police looked at D.J.'s phone records, they found a phone number belonging to appellant. Appellant's phone number appeared in D.J.'s phone records at approximately the same time D.J. told police his phone had been stolen. On November 3, 2010, approximately a week after the shooting took place, investigators placed appellant's photograph in a photographic lineup and presented the lineup to the victim's girlfriend. She identified appellant as the shooter, telling investigators she was 100% sure he was the perpetrator.

A ballistics expert testified that a projectile and three shell casings recovered from the scene were all fired from the same .380 caliber weapon. The medical examiner testified the victim had five gunshot wounds, one of which was to the chest and the others to his hands and to one of his arms. The medical examiner stated that the gunshot wounds to the victim's hands and arm

---

[2] The phone number belonging to D.J. contacted the victim's cell phone ten times within the 20 minutes preceding the shooting.

were consistent with being defensive wounds. The gunshot that entered the victim's chest pierced his left lung, the left ventricle of his heart, and his liver. The medical examiner concluded the cause of death was multiple gunshot wounds and the manner of death was homicide.

1. The evidence adduced at trial and summarized above was sufficient to authorize a rational trier of fact to find appellant guilty beyond a reasonable doubt of the crimes for which he was convicted. See Jackson v. Virginia, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. Appellant contends the trial court erred when it made comments allegedly in violation of former OCGA § 17-8-57. The commentary at issue occurred during the defense's cross-examinations of the victim's girlfriend and the lead detective in the case. The relevant colloquies and summations of appellant's allegations are set forth below.

a. *Comments made during cross-examination of the victim's girlfriend.*

Appellant alleges the trial court's commentary during the cross-examination of the victim's girlfriend violated former OCGA § 17-8-57 and improperly bolstered her credibility. Appellant contends this was particularly harmful to his defense since the victim's girlfriend was the only eyewitness to the crime. The relevant portion of the cross-examination is as follows:

5

Q. Did anybody call you to tell you something about the incident?
A. Yes, sir.
Q. Do you remember who that was?
A. No, sir.
Q. Was it a friend?
A. I don't remember who told a friend.
Q. So a friend told a friend to call you?
A. No, sir. Can you say that again so I can understand?
Q. Who called you to tell you something about the incident?
[PROSECUTOR]: Objection. Hearsay.
THE COURT: How about that, [DEFENSE COUNSEL]?
[DEFENSE COUNSEL]: She can tell me about it. If she's the one that received a call, she can say--
THE COURT: I know, but what she says, what the other person says, might be hearsay. You did receive a call?
THE WITNESS: Yes, sir, but I don't remember who the phone call came from.
Q. [DEFENSE COUNSEL]: I thought you said you did. So you did receive a phone call and somebody told you something about the incident, correct?
A. Yes, sir.
Q. And you talked to them for a period of time?
A. It wasn't a period of time. It was short.
Q. And you don't have any recollection of that conversation?
A. No, they just told me that --
[PROSECUTOR]: Objection, Your Honor. She can't say what someone else said.
THE COURT: Ladies and gentlemen of the jury, when someone tells you what someone else says and they're not a party to the case and they're not under oath, that's considered hearsay.
[DEFENSE COUNSEL]: But there's also an exception to the hearsay rule that, if it's a present sense impression of what she heard, she can say what she heard. It might not be accurate, and that's --
THE COURT: I'm going to rule it out, [DEFENSE COUNSEL].
[DEFENSE COUNSEL]: Okay.

6

Q. [DEFENSE COUNSEL]: But you did, ma'am, just for the record, you did say you received a call?

THE COURT: **She probably received calls of grief, she probably recalls people just commenting, but I mean, you know, what are you going to?**

[DEFENSE COUNSE]: That's exactly my point, Your Honor.

THE COURT: **But this is not a fishing expedition.** Ask a question and maybe she can answer it, okay.

[DEFENSE COUNSEL]: Well, the original question was, "Did you receive a call to talk to you about the incident?" I wasn't saying about somebody giving their sympathy.

THE COURT: Okay.

[DEFENSE COUNSEL]: I asked her specifically, that was the question, did she --

THE COURT: She said somebody did and she doesn't remember the name.

[DEFENSE COUNSEL]: Okay. But she did say, and I just want to be clear that that's what I heard, that she said she did receive a call about somebody calling her about the incident.

THE COURT: That's right, and she said she doesn't remember the name. She did make that comment. I think the jury heard that.

(Emphasis supplied.)

Appellant takes specific issue with the trial court's comments highlighted in bold text, including the trial court's supposition as to the content of the phone call at issue and the trial court's characterization of defense counsel's line of questioning as a "fishing expedition." Appellant further opines that this exchange should have occurred outside the presence of the jury.

7

b. *Comments made during cross-examination of the lead detective.*

There were several times during the cross-examination of the lead investigator that appellant contends the trial court made comments in violation of former OCGA § 17-8-57.  The first comment occurred immediately after a bench conference concerning the State's objection that defense counsel's cross-examination was going into irrelevant matters, including a report that was not in evidence.  The relevant exchange appears below:

> Q. [DEFENSE COUNSEL]: So there was -- we already covered [K.H.] and then there was another [photographic lineup] after that. I just want the names of the second [photographic] lineup.
> A. Yes, sir.
> THE COURT: Did **I understand you to say** that you used the telephone numbers of the individuals who made calls close in time and used them in parts of the lineup?
> [LEAD INVESTIGATOR]: Yes, sir, if we could, and then also any information we might have received via telephone calls from unknown sources.

(Emphasis supplied.)  The other trial court comments concerned an objection posited by the State and defense counsel's line of questioning in regard to anonymous phone calls received by police during their investigation.

> Q. What was the information that you received in your anonymous calls?
> A. Said that they had seen [L.C.] and [K.H.] with a .380 handgun about a week ago.
> [PROSECUTOR]: Your Honor, I would just object to anything -- this is an anonymous caller. We have no idea who the --

8

THE COURT: They were just following leads and --

[DEFENSE COUNSEL]: And that's okay. That's why he -- that's fine.

THE COURT: Hold on. Let the State object.

[PROSECUTOR]: Your Honor, I think it's fine for him to ask, you know, did you receive some information, what did you do with that information, but to ask exactly what that information was would be hearsay, because first of all, it wasn't -- the information wasn't even given to [the lead investigator], it was given to [another officer]. And, second of all, the call was an anonymous caller. We can't say who that was.

[DEFENSE COUNSEL]: And, Your Honor, that's a jury question for them to decide the facts of the call.

THE COURT: No. No, when you're getting into anonymous calls, you're really getting outside of the scope. **Let's move along, if we can, please. I mean, you're going into things that are really way beyond the realm here. Come on, I'm going to allow it.** Go ahead.

[DEFENSE COUNSEL]: You're allowing him to --

THE COURT: No, I'm going to allow you to keep asking questions. Let's move on with this.

Q. [DEFENSE COUNSEL]: So that was -- you mentioned a second anonymous call and then you got another one after that, is that correct or no?

A. I'd have to double check.

THE COURT: **Would it be fair to say that you had a number of anonymous calls and you followed the leads?**

THE WITNESS: Correct.

Q. [DEFENSE COUNSEL]: And you followed the leads. And I think that's where the Judge is testifying. Did you, in fact, follow--A. Yes.

Q. -- all those leads?

A. Yes, we put them all in lineups.

(Emphasis supplied.)

9

Appellant contends these comments bolstered the testimony of the lead detective, and he takes issue with the trial court's characterization of defense counsel's questioning as being "beyond the realm." In addition, he complains that whether or not the lead detective followed leads gained from anonymous calls was a disputed fact and that the trial court's question, "Would it be fair to say that you had a number of anonymous calls and you followed the leads?" constituted testimony by the trial court and had the effect of taking the task of reconciling any evidentiary disputes away from the jury.

c. *Analysis*

Former OCGA § 17-8-57 prohibited a judge, who was adjudicating a criminal case, from expressing or intimating to the jury his or her opinion as to whether facts had been proved or as to the guilt or innocence of a defendant. At the time of trial, OCGA § 17-8-57 (1985)[3] provided that the remedy for a violation was reversal of the conviction and remand to the trial court, whether

---

[3] OCGA § 17-8-57 (1985) provided:

> It is error for any judge in any criminal case, during its progress or in his charge to the jury, to express or intimate his opinion as to what has or has not been proved or as to the guilt of the accused. Should any judge violate this Code section, the violation shall be held by the Supreme Court or Court of Appeals to be error and the decision in the case reversed, and a new trial granted in the court below with such directions as the Supreme Court or Court of Appeals may lawfully give.

or not the defendant contemporaneously objected to the alleged improper comments. In 2015, the statute was amended such that if a timely objection is not made and the alleged improper comments do not concern the guilt of the accused, then reversal is only required if plain error is found. See OCGA § 17-8-57 (b) (2015).[4] This Court recently held that the 2015 standard of appellate review applies even if the criminal trial occurred prior to the amendment's effective date. See Willis v. State, __ Ga. __ (2) (b) (816 SE2d 656) (2018). This case was appealed after the 2015 amendment and appellant did not object to the trial court's comments, which do not relate to the guilt of appellant. Therefore, we will apply the post-amendment standard of review, which allows

---

[4] OCGA § 17-8-57 (2015) provides:

(a)(1) It is error for any judge, during any phase of any criminal case, to express or intimate to the jury the judge's opinion as to whether a fact at issue has or has not been proved or as to the guilt of the accused.
(2) Any party who alleges a violation of paragraph (1) of this subsection shall make a timely objection and inform the court of the specific objection and the grounds for such objection, outside of the jury's hearing and presence. After such objection has been made, and if it is sustained, it shall be the duty of the court to give a curative instruction to the jury or declare a mistrial, if appropriate.
(b) Except as provided in subsection (c) of this Code section, failure to make a timely objection to an alleged violation of paragraph (1) of subsection (a) of this Code section shall preclude appellate review, unless such violation constitutes plain error which affects substantive rights of the parties. Plain error may be considered on appeal even when a timely objection informing the court of the specific objection was not made, so long as such error affects substantive rights of the parties.
(c) Should any judge express an opinion as to the guilt of the accused, the Supreme Court or Court of Appeals or the trial court in a motion for a new trial shall grant a new trial.

11

reversal only if there is plain error. Id. This Court has set forth the plain error test as follows:

> First, there must be an error or defect—some sort of deviation from a legal rule—that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error—discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

(Citations and punctuation omitted.) State v. Kelly, 290 Ga. 29 (2) (a) (718 SE2d 232) (2011). Appellant cannot show plain error.

OCGA § 17-8-57 does not generally apply to colloquies between the trial court and counsel that concern the admissibility of evidence. See Palsay v. State, 285 Ga. 616 (3) (680 SE2d 583) (2009). Here, when viewed in the full context of the trial proceedings, several of the comments at issue arose during colloquies with counsel and within the context of the trial court's ruling on an evidentiary objection. "[R]emarks of a judge assigning a reason for his ruling are neither an expression of opinion nor a comment on the evidence." (Punctuation omitted.) McGinnis v. State, 258 Ga. 673 (4) (372 SE2d 804)

12

(1988). See also <u>Dailey v. State</u>, 297 Ga. 442 (2) (774 SE2d 672) (2015).

Insofar as the trial court was explaining its rulings on evidentiary objections, appellant cannot meet the first prong of the plain error test that there was a deviation from any rule. See <u>Ridley v. State</u>, 290 Ga. 798 (2) (725 SE2d 223) (2012). For example, in describing defense counsel's questioning as a "fishing expedition" and "beyond the realm," it appears from the entire context of the colloquies that the trial court was emphasizing to defense counsel that it was inappropriate to posit questions that would elicit hearsay. See <u>Smith v. State</u>, 292 Ga. 588 (2) (740 SE2d 129) (2013) (the trial court is allowed to "guide counsel" in order to ensure a fair trial). In addition, a trial court may, as it did here during the defense's cross-examination of the lead investigator, "propound clarifying questions in order to develop the truth of a case." <u>Butler v. State</u>, 290 Ga. 412 (4) (721 SE2d 876) (2012). Furthermore, the trial court did not make any statements about the credibility of either witness and so appellant's assertion of improper bolstering is without merit.[5] In the absence

---

[5] Cf. <u>Murphy v. State</u>, 290 Ga. 459 (1) (722 SE2d 51) (2012) (trial court's comments that the investigator was a "good detective" and made "good efforts [to investigate]" constituted commentary on credibility of witness in violation of OCGA § 17-8-57).

of the violation of a clear rule, appellant cannot establish the first prong of the plain error test.

Appellant also cannot establish the third prong of the test—that the outcome of the trial court proceedings likely was affected. For example, although the trial court may have unnecessarily speculated[6] as to the content of the phone call received by the victim's girlfriend, her actual testimony was unequivocal that she did not recall the specific details of the call. Also, there was no evidence presented to the jury that any anonymous calls made to the investigators led to the identification of a perpetrator. Indeed, the trial record shows the police presented the victim's girlfriend six different lineups which included photographs of various persons either connected to the victim's cell phone or connected to anonymous information received during the investigation. The victim's girlfriend did not identify anyone as the shooter until police presented the last lineup which contained appellant's photograph. Appellant's name became known to investigators because his phone number appeared in the phone records of D.J., whose phone had been stolen and whose phone number appeared in the victim's cell phone in the 20 minutes prior to

---

[6] See, e.g., Dailey v. State, supra, 297 Ga. at 444 (trial court's "musing" was unnecessary and should have been avoided, but did not violate OCGA § 17-8-57).

14

the shooting. Given this evidence, it is doubtful that the outcome of the trial was affected by any of the trial court's comments singled out by appellant. Accordingly, there is no plain error. See <u>Allen v. State</u>, 296 Ga. 785 (6) (770 SE2d 824) (2015).

<u>Judgment affirmed. Melton, C.J., Nahmias, P.J., Hunstein, Blackwell, Boggs, Peterson, and Warren, JJ., concur.</u>