304 Ga. 594
FINAL COPY

S18A0775.   JONES v. THE STATE.

WARREN, Justice.

Rico Jones was found guilty of felony murder, five counts of cruelty to children in the second degree, and one count of possession of marijuana in connection with the drowning death of Camyria Arnold.[1]  Jones contends that the evidence was insufficient to sustain his convictions and that the trial judge

---

[1] Camyria Arnold died on December 27, 2010.  On May 29, 2013, a Dougherty County grand jury indicted Jones on eight counts: felony murder of Camyria predicated on three counts of second degree cruelty to children; three counts of second degree cruelty to children upon Camyria by asphyxiation, strangulation, and drowning; three counts of second degree cruelty to children upon Camyria and her siblings N. H. and P. J. by "exposing said child[ren] to marijuana by smoking marijuana in the child[ren]'s presence"; and possession of less than one ounce of marijuana.  After a trial held from July 8 through 12, 2015, the jury found Jones not guilty of cruelty to children by strangulation and guilty of all remaining charges.  On August 27, 2015, the trial court sentenced Jones to life imprisonment for felony murder; three terms of ten years of probation for cruelty to children by smoking marijuana in the children's presence, to run consecutively to the life sentence but concurrently to each other; and time served for possession of marijuana.  Two counts of cruelty to children in the second degree (asphyxiation and drowning of Camyria) merged with the felony murder conviction for sentencing purposes.  Jones filed a motion for new trial on September 9, 2013, and amended it on February 12, 2015 and again on February 13, 2015.  After a hearing on March 27, 2015, the trial court denied the amended motion for new trial on July 10, 2017.  Jones filed a notice of appeal on July 14, 2017.  This case was docketed to the April 2018 term of this Court and submitted for a decision on the briefs.

erred by expressing an opinion about the evidence in violation of OCGA § 17-8-57. We agree that the evidence was insufficient to support Jones's convictions for cruelty to children in the second degree by smoking marijuana in the children's presence, and we reverse the convictions for those three counts. The evidence was legally sufficient to support the jury's guilty verdicts on the remaining counts, however, and we identify no violation of OCGA § 17-8-57. We therefore affirm Jones's remaining convictions.

1. Viewed in the light most favorable to the jury's verdicts, the evidence presented at trial showed the following. On December 26, 2010, at around 7:00 a.m., Jones drove his girlfriend, Porsha Harper, to work at a Waffle House. The two had one child together, one-year-old P. J., who rode in the car with Jones when he took Harper to work. Harper also had two other children, three-year-old Camyria and five-year-old N. H., whom Jones left at home asleep in the family's Albany apartment.

A few hours after Jones dropped Harper off, Jones returned to the Waffle House with N. H. and P. J. in the car and told Harper that he had taken Camyria to the hospital. Jones told Harper that when the children got up that morning, he discovered that Camyria and N. H. had wet the bed. He disciplined the two children by spanking them with a belt and then gave them a bath. After the

children got out of the bath, Jones told Camyria and N. H. to lie down for a nap. Jones then fell asleep for "five to ten minutes" before waking up to P. J. crying. When he woke up, Jones said, he noticed Camyria walking strangely, as though she were dizzy or drunk, and she looked drowsy. As Jones explained it, he thought Camyria might have swallowed some medicine, so he put his finger down her throat and she threw up a little bit of water and red fluid. Jones said that he then held Camyria under a cold shower for one or two seconds to try to wake her up. He said that Camyria seemed more alert for a few minutes, but then began acting drowsy again, so he rushed her to the hospital.

Upon arrival at the hospital, Camyria was unresponsive, barely breathing, and had a core body temperature of 91 degrees, indicating that her body was shutting down and she was "about half dead." Her eyes were fixed and dilated, suggesting significant brain injury. The attending physician, Dr. Raymond Gutierrez, heard "rales" or crackling sounds when he listened to her breathing, indicating that she had fluid in her lungs. Camyria vomited a pink-tinged watery emesis, which also can be a sign of fluid overloading the lungs.[2] Dr. Gutierrez ordered a CT scan, which showed swelling of the brain, and a

_____

[2] An initial toxicology test showed the presence of cannabinoids in Camyria's system.

chest x-ray, which showed inflammation and "infiltrates" (foreign matter) in the lungs.  Blood tests showed that Camyria had a critically low sodium level. She had fresh purple-and-red linear bruises on her inner left thigh and outer right thigh and hip, and also had fresh bruises on her abdomen.

When Harper arrived at the hospital, she noticed what looked like belt marks on Camyria's thighs.  She told Jones that he had whipped Camyria too hard.  Camyria's grandmother, who had come to the hospital, also noticed bruises on Camyria's neck, legs, arm, and chest.  The grandmother had checked Camyria for bruises the day before, as she did every time she saw Camyria, and had found none.

When Dr. Gutierrez asked Jones what had happened, Jones's responses were evasive and his demeanor was "stoic" and "flat"; he did not seem upset. Jones told Dr. Gutierrez that he had put Camyria in the bathtub with her sibling and then had fallen asleep.  Dr. Gutierrez asked if Camyria had swallowed anything or been sick before Jones brought her to the hospital, and Jones responded that she had not.  After Harper arrived at the hospital, Dr. Gutierrez told Harper and Jones that Camyria probably would not survive.  Harper was very upset, but Jones did not respond.  Because the hospital in Albany was not

equipped to care for critically ill children, Camyria was transferred to a hospital in Macon, where she passed away on December 27, 2010.

Dr. Yameika Head, an expert in Child Abuse Pediatrics, examined Camyria's body at the hospital. Dr. Head found unusual rectangular-shaped bruises on Camyria's outer left thigh and the left side of her neck. She also found a deep bruise on the outside of her right thigh and bruising on the inside of both thighs, which is a part of the body where children do not usually get bruises. Dr. Head also reviewed Camyria's medical records and discussed the child's history with Camyria's biological father and paternal grandmother. Based on all of this information, Dr. Head was "very concerned" that Camyria had suffered "inflicted trauma or child abuse, until proven otherwise."

A Georgia Bureau of Investigation medical examiner, Dr. Melissa Sims, performed an autopsy on Camyria. Dr. Sims determined that Camyria's death was caused by complications from asphyxia, which means that the body is unable to receive or use oxygen. Camyria's inflammation of the lungs, brain swelling, and low sodium level all were consistent with an asphyxial event. Forms of asphyxia include, among others, hanging, strangulation, choking, drowning, smothering, and positional asphyxia. In Dr. Sims's opinion, the most likely asphyxial event in Camyria's case was drowning. A freshwater

drowning, which can occur in a bathtub, will cause water to pass through the membranes of the lungs and into the blood supply, diluting the blood and lowering a person's sodium level. Dr. Sims determined that the manner of death was homicide, and that Camyria would have had to be submerged from one to three minutes to deprive her of oxygen long enough to cause the injuries seen during her autopsy.

At trial, Dr. Gutierrez testified that his clinical impression was that Camyria had been drowned by being submerged and held under water. He testified that a neurologically typical three-year-old who fell in water would push herself up out of the water and would not simply lie in the water and drown. Dr. Gutierrez acknowledged that a very low sodium level was a dangerous and potentially fatal condition for a child, and that a sodium level that low could cause swelling of the brain. He also agreed that low sodium could cause a child to appear drowsy or drunk, but explained that splashing cold water on a child in that condition would not cause her to improve, even for a few minutes.

Dr. Gutierrez determined that Camyria's sodium level dropped quickly, given Jones's statement that Camyria had not been sick before that morning. A sudden drop in sodium level could occur from drowning or if a person drank

six gallons of water all at once. But all of her other symptoms were consistent with having been held under water and drowned. Dr. Gutierrez testified that being held under water would have been "horrific" and painful for Camyria.

Dr. Joseph Burton, an expert in forensic pathology, testified on behalf of the defense. Dr. Burton disagreed with Dr. Sims's conclusion that Camyria's death was caused by an asphyxial event. Instead, Dr. Burton opined that Camyria's autopsy findings were explained by low sodium. A very low sodium level will cause brain swelling, which in turn will cause a person to stop breathing and die. Low sodium has a range of potential causes, including drinking too much water, a blood clot in the brain, diarrhea, vomiting, excessive sweating, kidney disease, or tumors on the pituitary or adrenal glands. Dr. Burton agreed, however, that drowning also could cause low sodium, and that Camyria's history and medical records did not reveal any of the other causes of low sodium that he mentioned.

In addition, three of the State's witnesses testified about the potential effect of marijuana smoke on children. Dr. Gutierrez testified that long-term exposure to marijuana smoke could be harmful to children and that studies show that young people who smoke marijuana have diminished cognitive function later in life. Dr. Head, the Child Abuse Pediatrics expert who

examined Camyria's body in the hospital, testified that secondhand marijuana smoke can lead to problems with cognitive function or asthma in children. And Investigator George Camp, a GBI-certified narcotics officer with specialized drug training in marijuana identification who was exposed to marijuana smoke as part of training, testified that for him personally, marijuana smoke causes a "slight euphoric high" followed by a migraine headache.

2. Jones contends that the evidence introduced at trial was insufficient for the jury to find him guilty of felony murder and five counts of cruelty to children in the second degree. We disagree with respect to the conviction of felony murder and the two predicate counts of second-degree child cruelty that merged into it and affirm that conviction because the evidence is legally sufficient to support it. We agree, however, that the evidence is legally insufficient to support Jones's convictions for three counts of second-degree child cruelty based on smoking marijuana in the presence of children and, as a result, reverse those convictions.

When evaluating a challenge to the sufficiency of the evidence, we view all of the evidence presented at trial in the light most favorable to the verdict and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted. See

*Jackson v. Virginia*, 443 U. S. 307, 318-319 (99 SCt 2781, 61 LE2d 560) (1979). Our review leaves to the jury the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be made from the facts. See id.; *Walker v. State*, 296 Ga. 161, 163 (766 SE2d 28) (2014). "As long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case, the jury's verdict will be upheld." *Williams v. State*, 287 Ga. 199, 200 (695 SE2d 246) (2010) (citation and punctuation omitted).

(a) To support the conviction for felony murder, the State was required to prove that Jones proximately caused Camyria's death while in the commission of cruelty to children in the second degree, by asphyxiating or drowning Camyria. See OCGA § 16-5-1 (c); *State v. Jackson*, 287 Ga. 646, 660 (697 SE2d 757) (2010). A person commits the offense of cruelty to children in the second degree when, with criminal negligence, he causes a minor child "cruel or excessive physical or mental pain." OCGA § 16-5-70 (c). Criminal negligence, in turn, is "an act or failure to act which demonstrates a willful, wanton, or reckless disregard for the safety of others who might reasonably be expected to be injured thereby." OCGA § 16-2-1 (b); *Johnson v. State*, 292 Ga. 856, 858 (742 SE2d 460) (2013).

Here, the evidence showed that Jones was the only adult at home with Camyria when she suffered fatal injuries.  Camyria had not previously shown signs of critically low sodium or other serious illness, and according to Jones's own account, was fine when she woke up that morning.  Yet two hours later, she was unresponsive and "about half dead" with a low body temperature, dilated and fixed pupils, brain swelling, low sodium, and fluid in her lungs, all of which were consistent with drowning.  Medical personnel and family members observed fresh bruises on Camyria's abdomen, inner thighs, and neck that were not explained by Jones's account of spanking her with a belt.  And Jones's explanation of what happened after he put Camyria in the bathtub was inconsistent: he first told an emergency room physician that he left Camyria in the bathtub unattended, that he had fallen asleep, and that Camyria had not swallowed anything that might explain the symptoms he observed when he woke up and saw her.  Shortly afterward, however, Jones told Harper that he had bathed Camyria and N. H., that Camyria started acting strangely after the children woke up from a nap, and that he thought Camyria might have swallowed some medicine.

Based on Camyria's injuries and medical records, and on interviews with Camyria's relatives, an expert in child abuse pediatrics who examined Camyria

testified that she was "very concerned for inflicted trauma or child abuse." The emergency room physician who treated Camyria at the hospital testified that, in his clinical opinion, Camyria had been held under water and drowned, a "horrific" and painful experience for the child. And the GBI medical examiner testified that the cause of Camyria's death was asphyxiation, most likely by drowning, and that her death was a homicide. This evidence was sufficient to permit a rational trier of fact to find beyond a reasonable doubt that Jones caused three-year-old Camyria cruel or excessive physical or mental pain with "willful, wanton, or reckless disregard" for her safety, and that in doing so he proximately caused her death. Although the defense presented an expert who opined that Camyria's death was caused by a critically low sodium level of unknown origin, the jury was authorized to reject this theory and accept the opinions of Camyria's treating physician and the GBI medical examiner instead. See *Smith v. State*, 302 Ga. 207, 209-210 (805 SE2d 835) (2017). Thus, the evidence was legally sufficient to support the conviction for felony murder based on cruelty to children in the second degree by asphyxiation and drowning of Camyria.

(b) In three counts of the indictment, Jones was accused of cruelty to Camyria, N. H., and P. J. by "exposing [the children] to marijuana by smoking

marijuana in the [children's] presence."   To prove the crime of cruelty to children in the second degree, the State must offer evidence that establishes, beyond a reasonable doubt, that a child suffered "cruel or excessive physical or mental pain."  OCGA § 16-5-70 (c); see *Gomez v. State*, 301 Ga. 445, 453, 456 (801 SE2d 847) (2017).  A jury may assess the circumstances of the nature of the injuries suffered to infer that pain inflicted by a defendant was cruel and excessive; expert testimony establishing that a defendant caused cruel or excessive pain is not required.  *Kennedy v. State*, 277 Ga. 588, 589-590 (592 SE2d 830) (2004).

Here, the State offered some evidence that Camyria had been exposed to marijuana and that exposure to marijuana smoke is generally harmful to children.  Dr. Gutierrez testified that Camyria's initial toxicology test was positive for cannabinoids, the active ingredient in marijuana, and Harper testified that, at various times, she and Jones smoked marijuana in the presence of the children, including in their apartment and in their car.[3]  And when police executed a search warrant on Harper and Jones's apartment on the day Camyria was taken to the hospital, they found a small piece of a marijuana cigarette in

---

[3] Jones, for his part, provided inconsistent statements to investigators about smoking marijuana around the children.

an ashtray on the kitchen counter.  The State also offered testimony from Dr. Gutierrez and Dr. Head about the general health problems marijuana smoke can cause children; each testified that long-term exposure to marijuana smoke can cause health problems like cognitive or developmental deficits and asthma. And a GBI-certified investigator testified about the negative effects he experienced personally when exposed to marijuana smoke during his law enforcement training.

But even presuming that Jones did smoke marijuana around the children, the State presented no evidence that Jones's smoking marijuana in the presence of Camyria, N. H., and P. J. caused them physical or mental pain, much less "cruel or excessive physical or mental pain."  Indeed, the record is devoid of evidence that any of the three children experienced pain from inhaling marijuana smoke, or that they suffered a physical or mental injury caused by marijuana smoke.  At most, the evidence showed that smoking marijuana around the children was "not good" for them and created an increased risk of future negative health effects.  That is not enough to meet the State's burden. See *Brewton v. State*, 266 Ga. 160, 161 (465 SE2d 668) (1996) (reversing cruelty to children conviction because no evidence established intent to harm or awareness that conduct was likely to cause harm); *Owens v. State*, 173 Ga.

App. 309, 311 (326 SE2d 509) (1985) (reversing cruelty to children in the second degree conviction because State presented insufficient evidence that defendant caused child "excessive physical pain by throwing said child on the bed and pushing a bottle in its mouth and hitting said child" as alleged in the indictment).

Under these circumstances, we conclude that the evidence presented at trial was insufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Jones caused Camyria, P. J., and N. H. "cruel or excessive physical or mental pain" by smoking marijuana in their presence. We therefore reverse Jones's three convictions for cruelty to children in the second degree based on smoking marijuana in the presence of the children.[4]

3.      Jones also contends that the trial judge violated OCGA § 17-8-57 by making the following comment at the conclusion of Dr. Gutierrez's testimony: "Let's take a quick break.  I think that was weighty testimony, we deserve a stretch break; do we not?  Let's do that."  Jones's counsel did not object to the comment at trial.  Citing the version of OCGA § 17-8-57 in effect

---

[4] We hold only that the State did not present sufficient evidence that marijuana smoke caused the three children in this case cruel or excessive physical or mental pain, and do not express a view on whether exposing children to marijuana smoke could ever constitute cruelty to children in the second degree under OCGA § 16-5-70.

at the time of his trial, Jones now claims that the judge's comment — which did not express an opinion about Jones's guilt — requires a new trial. We disagree.

We start by noting the proper standard of review. At the time of Jones's trial, OCGA § 17-8-57 provided that "[i]t is error for any judge in any criminal case, during its progress or in his charge to the jury, to express or intimate his opinion as to what has or has not been proved or as to the guilt of the accused." Under that former version of OCGA § 17-8-57, a violation of the statute required automatic reversal of a defendant's conviction. But the statute was amended in 2015 to add subsection (b), which provides that a party's failure to object to a trial judge's expression or intimation to the jury of the judge's opinion about whether a fact at issue has or has not been proved "shall preclude appellate review, unless such violation constitutes plain error which affects substantive rights of the parties." In *Willis v. State*, 304 Ga. 122, 128-129 (816 SE2d 656) (2018), we held that subsection (b)'s plain error standard applies retroactively to appellate review of cases, like this one, that were tried under the prior version of OCGA § 17-8-57 but appealed after the effective date of the statute's 2015 amendment. See also *Felton v. State*, 304 Ga. 565, 571 (819 SE2d 461) (2018).

In light of *Willis*, and given that Jones's counsel did not object to the judge's comment at trial, OCGA § 17-8-57 (b) controls our review of Jones's claim. Here, however, the trial judge's comment did not constitute error, let alone plain error, and therefore did not violate OCGA § 17-8-57 under either version of the statute. The trial judge made the comment at issue on the third day of trial, after Dr. Gutierrez testified at length about what happened when Camyria was admitted to the emergency room; the results of various medical tests; what Jones told doctors about Camyria's condition; and Dr. Gutierrez's clinical impression of the cause of Camyria's injuries. Among other things, Dr. Gutierrez recounted the rattling sound he heard in Camyria's lungs; the fresh bruises he observed on her thighs, abdomen, and neck; the swelling he observed in her brain; and the scene he witnessed when Camyria's mother was hysterical as medical professionals were "trying to bring [Camyria] back." It was only after Dr. Gutierrez concluded that testimony, and after he finished testifying on direct examination, cross-examination, and multiple rounds of re-direct and re-cross examination, that the trial judge said: "Let's take a quick break. I think that was weighty testimony, we deserve a stretch break; do we not? Let's do that."

Pointing to dictionary definitions, Jones argues that the trial judge's

characterization of Dr. Gutierrez's testimony as "weighty" was improper commentary on the evidence because "weighty" means "of much importance," "heavy," and "powerful." According to Jones, the judge's comment conveyed to the jury a belief that Dr. Gutierrez's testimony should be weighed heavily. But that argument views one word in isolation and ignores the context in which the comment was made: use of the word "weighty" was immediately preceded and followed by "Let's take a quick break" and "we deserve a stretch break; do we not?" Viewed in its full context, the jury could have reasonably understood this comment as the trial judge acknowledging the grave, unpleasant, and lengthy nature of testimony about a three-year-old child's fatal injuries — not, as Jones argues, the judge's belief that "Dr. Gutierrez's testimony was something to weigh very heavily in reviewing this case." Under these circumstances, the trial judge's comment cannot be reasonably construed as expressing or intimating an opinion as to what had or had not been proved — the type of comment that could violate the former and current versions of OCGA § 17-8-57. See *Pyatt v. State*, 298 Ga. 742, 746-747 (784 SE2d 759) (2016) (trial judge's comment appearing to agree with the State that a witness's statement was "critical evidence" did not violate OCGA § 17-8-57); *Dailey v. State*, 297 Ga. 442, 443 (774 SE2d 672) (2015) ("[T]he judge's comment here

in no way constituted the type of direct comment on the substance or weight of the evidence that we have held to violate [former] OCGA § 17-8-57."); *Smith v. State*, 297 Ga. 268, 270 (773 SE2d 269) (2015) (trial judge's comment that witness was a "very thorough investigator" did not express an opinion that bolstered the witness's credibility in violation of OCGA § 17-8-57).

Judgment affirmed in part and reversed in part. All the Justices concur.

NAHMIAS, Presiding Justice, concurring.

I join the Court's opinion in full, including its observation in footnote 4 that there could be a case in which exposure of children to marijuana smoke would constitute second-degree cruelty to children in violation of OCGA § 16-5-70 (c). Exposure to a significant amount of marijuana smoke — or other types of smoke — could cause a child cruel or excessive physical or mental pain if, for example, the exposure caused the child to suffer serious respiratory distress. And if a person so exposed the child with criminal negligence — meaning "willful, wanton, or reckless disregard for the safety of others who might reasonably be expected to be injured thereby," OCGA § 16-2-1 (b) — a violation of the child cruelty statute might be established.

This possibility, however, should not make us overlook what the State is trying to accomplish in this case. If the evidence that the District Attorney's office asserted was legally sufficient to indict, try, convict, and sentence Jones under OCGA § 16-5-70 (c), and that the Attorney General's office has defended as sufficient on appeal,[5] was held to be sufficient by this Court, then

---

[5] The District Attorney's office has not bothered to file a brief here.

Georgia prosecutors would be free to use that statute against tens or even hundreds of thousands of this State's citizens. Well over a million Georgians smoke cigarettes, and most of them have probably smoked in the vicinity of a child — meaning someone under the age of 18 — on at least a few occasions. The health risks posed by exposure to tobacco smoke are more widely understood and scientifically established than the dangers of exposure to marijuana smoke. If all it takes to prove felony child cruelty is the sort of evidence the State presented in this case, it would not be difficult at all for the State to find doctors who could testify about the general health problems cigarette smoke can cause children and the dangers of long-term exposure to cigarette smoke, or to find witnesses who could testify that they have personally experienced negative effects when exposed to cigarette smoke.

I certainly do not endorse the exposure of children (or anyone else) to cigarette smoke. In fact, our society's disapproval of second-hand smoke has become widespread enough that in recent years local governments and the General Assembly have prohibited smoking tobacco in areas where the smoke could affect other people. See, e.g., Georgia Smokefree Air Act of 2005, Ga. L. 2005, p. 1184, codified at OCGA §§ 31-12A-1 to 31-12A-13. But Jones was not prosecuted under those laws, which apply only to tobacco smoke.

When prosecutors assert that someone can be lawfully prosecuted, convicted, and sentenced to up to ten years in prison for *child cruelty* under circumstances like the ones presented in this case, we must recognize that prosecutors are asserting the discretion to do the same to anyone who has occasionally smoked cigarettes near someone under the age of 18 in the past seven years (the general statute of limitations for violations of OCGA § 16-5-70, see OCGA § 17-3-1 (c)).  Any time prosecutors take such an expansive view of what constitutes felonious conduct, judges — and the public — should be skeptical.

Under the position the State's prosecutors have taken in this case at trial and on appeal, almost every Georgian has friends or relatives who prosecutors could pursue as dangerous felons.  Of course, prosecutors are unlikely to turn the weapon they claim against prominent or popular individuals.  They are likely to aim the weapon only selectively against a handful of disfavored individuals like Jones, whose murder of a three-year-old child makes him an appealing target for all imaginable prosecutorial weapons — so appealing that the prosecutors convinced a jury to find Jones guilty of three counts of child cruelty, and convinced the trial court to enter convictions and sentence him for those supposed crimes, based entirely on his occasionally smoking marijuana with the children's mother in the presence of children as to whom there was no

evidence whatsoever of painful effects.[6]

Our State's prosecutors should be more judicious about their views regarding the reach of the criminal statutes they enforce, rather than seeking to extend those statutes in ways that would effectively criminalize the conduct of large swaths of our State's population. The Court today properly rejects the State's assertion that the evidence it presented at trial proved that Jones violated OCGA § 16-5-70 (c), and in so doing, the Court prevents the State from acquiring a prosecutorial weapon of vast and unsupported scope.

I am authorized to say that Justices Blackwell, Boggs, and Peterson join in this concurrence.

---

[6] The record indicates that the children's mother, Porsha Harper, was also charged with cruelty to children based on her smoking marijuana with Jones in their presence; she entered a negotiated guilty plea, presumably based on the same evidence presented at Jones's trial, and agreed to testify against him. Although we are reversing Jones's child cruelty convictions, it is not clear that Harper has any judicial remedy to challenge her convictions — or at least any remedy that could be obtained without the State's support.

Decided October 22, 2018.

Murder. Dougherty Superior Court. Before Judge Marshall.

<u>Troy E. Golden</u>, for appellant.

<u>Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew M. Youn, Assistant Attorney General</u>, for appellee.