NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: August 12, 2025

S25A0604. FRIPP v. THE STATE.

ELLINGTON, Justice.

Jeremiah Fripp appeals his convictions for malice murder and other crimes in connection with the shooting death of Sherman Ratliff and the armed robbery of Qwondez Calvert.[1] Fripp contends

---

[1] The crimes occurred on November 27, 2020. On June 25, 2021, a Laurens County grand jury returned an indictment charging Fripp with malice murder (Count 1); felony murder (Counts 2-3); armed robbery of Ratliff (Count 4); armed robbery of Calvert (Count 5); aggravated assault of Ratliff (Counts 6-7); aggravated assault of Calvert (Counts 8-9); and possession of a firearm during the commission of a felony (Count 10). At the conclusion of a jury trial that began on June 14, 2023, the jury found Fripp guilty on all counts. On July 31, 2023, the trial court sentenced Fripp to life in prison without the possibility of parole for the count of malice murder (Count 1). The felony murder counts (Counts 2-3) were vacated by operation of law. The court imposed a 20-year prison term for the armed robbery of Ratliff (Count 4), to run consecutively to Count 1, and a 20-year prison term for the armed robbery of Calvert (Count 5), to run consecutively to Counts 1 and 4. The court merged each of the aggravated assault counts (Counts 6-9) into Counts 4, 6, 5, and 8 respectively. The court imposed a five-year prison term for the firearms charge (Count 10), to run consecutively to Counts 1, 4, and 5.

Prior to his sentencing, Fripp filed a premature motion for new trial, which ripened upon entry of the final disposition order. See *Tavarez v. State*,

that the evidence was insufficient to support his convictions, that his trial counsel provided constitutionally ineffective assistance for failing to pursue an alibi defense, and that the trial court erred by giving a misleading jury instruction on the defense of coercion that was not tailored to the evidence. For the reasons explained below, we affirm.

1.    Viewed in the light most favorable to the verdicts, the evidence presented at trial showed that, on November 27, 2020, Ratliff and his cousin, Calvert, drove from Collins, Mississippi to Dublin, Georgia to pick up an AK-style gun that belonged to Ratliff. Calvert testified that, at some point during the drive, Ratliff spoke on the phone with someone Ratcliff called "Baby Four," who told Ratliff where to meet them in Dublin. When Ratliff and Calvert arrived at the meeting place, they drove into a recreational ballpark

---

319 Ga. 480, 480 n.1 (2024). He filed another motion for new trial, which he amended through new counsel. On June 4, 2024, Fripp filed a second amended motion for new trial and brief in support. Following a hearing on the motion, the trial court denied the motion for new trial, as amended, on November 12, 2024. Fripp filed a timely notice of appeal, and the case was docketed in this Court to the April 2025 term and submitted for a decision on the briefs.

where they parked and waited. Ratliff received a phone call, and soon thereafter, a red car pulled up next to them, and a short man got out of it. Ratliff got out of his car to speak with the man while Calvert remained in the car. Ratliff was carrying a pistol when he got out of the car. Moments later, a black car pulled up, and Ratliff handed the gun to Calvert, who placed the pistol on the driver's side floor. "Four to five" men got out of the black car wearing all black clothing and ski masks, and Calvert rolled up the windows and locked the doors. The man who arrived in the red car was "[s]till there" at this time, and when Calvert locked the doors, the men, including the man from the red car, drew their weapons and pointed them at Ratliff and Calvert.

Calvert testified that one man attempted to open the locked car door and threatened to shoot Calvert if he did not unlock the car door, so Calvert complied. Two men dragged Calvert out of the car, and one man rummaged through the car and took Calvert's cell phone while another—the short man from the red car—pistol-whipped Calvert until Calvert fell to his knees. While Calvert was

still on his knees, Ratliff attempted to run away. One of the men, who was holding a "Draco"-style gun, shot Ratliff in the back, and Ratliff collapsed to the ground. Moments later, Calvert heard sirens in the distance. The man from the red car got in his car and "left after the shooting," and the men from the black car threw their guns in the trunk, "jumped in [the car,] and pe[e]led out." After the assailants drove away, Calvert put Ratliff in their car and tried to find a hospital. He flagged down a paramedic who called for police and additional EMS assistance. Ratliff later died at the hospital, and his cause of death was determined to be the gunshot wound to the back.

When officers arrived to the scene of the shooting, Calvert told them that the "leader" of the group was about six feet tall with a long "dreads" hairstyle. He held the Draco-style gun and was the one who was instructing others what to do. Although Calvert did not see who shot Ratliff, he believed it was the man with the Draco-style gun.

Calvert's trial testimony about the timing of the departure of

4

the two cars was not entirely consistent with his initial statement to police. In the police body-camera footage from the night of the shooting that was played for the jury, Calvert told the officer at the scene that the red car pulled up first, and then it "pulled off, and another car pulled up," indicating that the red car had left before the shooting occurred. On cross-examination, Calvert conceded that, in his initial statement to police on the night of the shooting, he said that the red car had left before the black car pulled up, that he could not give detailed descriptions of any of the men from the black car, and that he did not mention them wearing ski masks. Calvert also testified that, in his initial statement to police, he said that he believed that the person with dreadlock-style hair was called "Baby Four," was taller than 5' 9", and was the leader of the group. Calvert also testified that the leader was the one holding the AK-style or Draco-style gun and was the one who shot Ratliff.

During their canvas of the crime scene, law enforcement officers did not locate Calvert's cell phone that the assailant had grabbed out of the car, but law enforcement did find a cell phone

5

belonging to Jeremiah Salter. Officers visited Salter's residence and informed Salter's brother that Salter was wanted for questioning related to a murder.

On November 29, 2020, Fripp and Salter went to a police station in Columbia, South Carolina. They arrived in a red car, which they parked in the station parking lot. Upon entering the station, they told an officer that they were wanted for questioning involving the murder of a man named Sherman Ratliff in Dublin, Georgia.

Officer Timothy Carpenter testified that he asked Fripp what his involvement was, and Fripp responded, "I did it." The officer asked for clarification, and Fripp stated, "I killed him." The officer asked, "The Sherman guy?" to which Fripp nodded his head affirmatively and stated, "Yeah." Officer Carpenter testified that, at that time, Fripp and Salter were not under arrest and were free to leave but that, while trying to obtain a body camera, Officer Carpenter spoke with Investigator James Fisher, who wanted to detain them for further questioning. Officer Carpenter was never

6

able to retrieve a body camera and did not otherwise record the conversation with Fripp. He testified that Salter's only statement was that he came to the police station because officers showed up at his house stating that Salter's phone was found at the scene.

Investigator Fisher testified that when he encountered Salter and Fripp in the police station lobby, Fripp repeated his statement that he had been involved in Ratliff's shooting, and Salter did not say anything. Investigator Fisher then placed Salter and Fripp in two separate interview rooms until the Dublin police could arrive to continue the investigation but did not conduct his own custodial interviews.

The South Carolina police officers contacted law enforcement in Dublin and secured a warrant to search Fripp's car, which was still in the Columbia police station parking lot. While searching the car, the officers recovered a Draco-style rifle gun from the trunk and a pistol from the backseat. A GBI firearms examiner test-fired the weapons and compared the markings on the test-fired bullets and shell casings with the markings on the shell casing recovered from

7

the crime scene and the bullet fragment recovered from Ratliff's body. He determined that the Draco-style gun retrieved from Fripp's trunk was the same gun that killed Ratliff. A gun trace performed on the gun that was used to kill Ratcliff showed that Ratliff was its original purchaser.

Fripp testified at trial to the following. Fripp, Ratliff, and Salter were friends. On the night of the shooting, he received a phone call from Ratliff informing him that Ratliff and Calvert were at the ballpark, and that he came to the park to speak briefly with Ratliff. While they talked for about five minutes, Ratliff informed Fripp that Ratliff was waiting on someone else to arrive. He then left the park and drove to his mother's house before anyone else arrived and was not present for the shooting.

The next day, Salter called Fripp requesting a ride. When Fripp arrived to pick him up, Salter asked Fripp to open his trunk so that he could put something in it. Fripp did not see Salter carrying a weapon. However, he believed Salter had a gun concealed on his person and that Salter put that gun in Fripp's trunk. Salter then put

a second gun in the backseat. They then drove to visit Fripp's cousin, Lashonda Dupree, in Columbia. When they arrived, they were hanging out in front of Dupree's apartment, and Salter was "jittery." Without testifying as to what was said, Fripp testified that, following the conversation that took place, Dupree advised them to turn themselves in. From there, they drove to the police station, and on their way to the police station, Salter aggressively threatened Fripp in a way that made Fripp feel that his family members' lives were in danger if he did not admit to the shooting.

After receiving Salter's threat, he and Salter drove to the police station where he gave his false statement. He did not kill Ratliff and did not have any animosity or anger toward him. He was shocked and saddened to learn that Ratliff had died and did not know anything about Calvert's testimony regarding the stolen cell phone, the pistol-whipping, or the taking of a gun that belonged to Ratliff. He did not have a dreadlock hairstyle, himself, and he was neither six feet tall, nor was he the short man from the red car who pistol-whipped Calvert. Further, he was not aware that Salter arrived at

9

the park after he left.

2. Fripp contends that the evidence was legally insufficient to support his convictions as a matter of constitutional due process. He argues that Calvert's testimony, upon which the State largely depended, was impeached by Calvert's prior inconsistent statements to the police. Specifically, Fripp asserts that, on the night of the shooting, Calvert told officers that the red car had left before the shooting occurred. Two years later, however, Calvert changed his story and testified that the red car was still there during the shooting. Additionally, Fripp contends that there was no physical evidence collected at the scene related to him and that "the murder weapon was found in his car" only because Salter placed it in Fripp's trunk before they headed to the police station. He argues that he was unable to provide any details about the shooting to law enforcement because he was not present, that he only admitted to the shooting because Salter "coerc[ed]" him to, and that, accordingly, the State failed to provide sufficient evidence to establish Fripp's guilt beyond a reasonable doubt. We disagree.

10

"When evaluating a challenge to the sufficiency of the evidence, we view all of the evidence presented at trial in the light most favorable to the verdict and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted." *Jones v. State*, 304 Ga. 594, 598 (2018) (citing *Jackson v. Virginia*, 443 U. S. 307, 318-19 (1979)). "This Court does not reweigh evidence or resolve conflicts in testimony but rather defers to the jury's assessment of the weight and credibility of the evidence." *Davis v. State*, 316 Ga. 418, 420 (2023).

Fripp first argues that the evidence was insufficient to convict because the State relied on Calvert's trial testimony which contradicted his statements to the police as depicted in the body camera video from the night of the shooting. But just as the court instructed, it was the jury's role to determine the credibility of the witnesses and to decide whether there was a reasonable explanation for any inconsistencies in a witness's pre-trial statements. See *Harris v. State*, 313 Ga. 225, 229 (2022) ("We leave to the jury the

11

resolution of conflicts or inconsistencies in the evidence, . . . and we do not reweigh the evidence." (citations and punctuation omitted)).

Here, the evidence was sufficient to support Fripp's convictions. Viewed in the light most favorable to the verdicts, Fripp's own testimony that he arrived at the scene to meet with Ratliff, his own admission that he "did it," his arrival at the police station in a red car with the gun that was used to kill Ratcliff inside, and Calvert's testimony at trial all support the jury's finding Fripp guilty of the counts beyond a reasonable doubt. See *Jones*, 304 Ga. at 598; see also *Davis*, 316 Ga. at 420 (evidence sufficient to convict for felony murder because it showed defendant shot and killed the victim in front of eyewitnesses, admitted the shooting to his uncle, and was in possession of the gun that was used to kill the victim two days after the shooting); see also *Matthews v. State*, 311 Ga. 531, 536–37 (2021) (defendant's admission to stabbing the victim and possession of a steak knife set matching the knife blade used to stab the victim constituted sufficient evidence to authorize defendant's convictions of malice murder and possession of a knife during the

commission of a crime). It was the jury's role to assess the credibility of witnesses and resolve inconsistencies, and here, the jury was entitled to believe Calvert's trial testimony, even if it was inconsistent with a prior statement, and to disbelieve Fripp's testimony that he had left the scene before the shooting. See *Harris*, 313 Ga. at 229.

Fripp next contends that there was no physical evidence collected at the scene related to him and that "the murder weapon was found in his car" only because Salter put it in his trunk before they went to the police station. But the State "was not required to produce any physical evidence." *Jackson v. State*, 307 Ga. 770, 772 (2020) (citation and punctuation omitted). "Although the State is required to prove its case with competent evidence, there is no requirement that it prove its case with any particular sort of evidence." Id. (citation and punctuation omitted).

Finally, as to Fripp's argument that he was "coerc[ed]" to make the statement to police, while the jury heard Fripp's testimony that Salter threatened him on the way to the police station, the jury also

13

heard testimony that Fripp and Salter were friends, that Fripp drove his own car and Salter to the police station, and that Fripp made the statement twice, to two separate officers, while he was not under arrest and was still free to leave the police station. It was the jury's duty to assess credibility and weigh the evidence of Fripp's testimony about the alleged threat against the police officer's testimony about Fripp's giving of the statement and the other evidence of his guilt. The jury was authorized to disbelieve or give less weight to Fripp's testimony that he was "coerc[ed]" into admitting to the crimes, and this Court does not reweigh evidence. See *Harris*, 313 Ga. at 229; *Davis*, 316 Ga. at 420.

Viewing the evidence in the light most favorable to the verdicts, we conclude that it was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Fripp was guilty of the crimes of which he was convicted. See *Harris*, 313 Ga. at 229; *Jones*, 304 Ga. at 598.

3.   Fripp next contends that his trial counsel was constitutionally ineffective for failing to pursue an alibi defense.

14

Specifically, he asserts that he would have benefitted from an alibi witness's testimony that could support Calvert's original statement—and Fripp's testimony—that Fripp had left before the shooting. Further, he argues that his counsel admitted at the motion for new trial hearing that there were "a couple of people that probably could have served as alibi witnesses" but that his counsel failed to call any of them and even failed to pursue Salter as a potential alibi witness based only on his assumption that Salter would not testify. But because Fripp does not name who the alibi witnesses would have been and has failed to show how his trial counsel's decision to forgo pursuing an alibi defense prejudiced him, his ineffective assistance claim fails.

In order to succeed on his claim of ineffective assistance, Fripp must prove both that his trial counsel's performance was deficient and that there is a reasonable probability that the trial result would have been different if not for the deficient performance. *Strickland v. Washington*, 466 U. S. 668, 687 (1984); see also *McKelvey v. State*, 311 Ga. 34, 42 (2021). To satisfy the deficiency prong, Fripp "must

show that counsel performed his duties in an objectively unreasonable way, considering all the circumstances and in light of prevailing professional norms." *Bowman v. State*, 319 Ga. 573, 576 (2024) (citations and punctuation omitted). To satisfy the prejudice prong, Fripp "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Palmer v. State*, 310 Ga. 668, 678 (2021). "If an appellant fails to meet his burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." *Lupoe v. State*, 284 Ga. 576, 578 (2008).

Here, Fripp has failed to demonstrate prejudice. At the hearing on Fripp's motion for new trial, he failed to identify a single witness who "would have given him a solid and complete alibi for the time of the murder." *McKelvey*, 311 Ga. at 44. This failure to present the testimony of Salter, any other alibi witness, or a legally acceptable substitute, "as required to demonstrate prejudice in the context of ineffective assistance of counsel," is detrimental to his claim of ineffective assistance. *Palmer*, 310 Ga. at 678; see also *Lupoe*, 284

16

Ga. at 578 (explaining that there can be no ineffective assistance where "[t]he alleged alibi witness that [the defendant] claims should have been investigated by his trial counsel did not testify at the motion for new trial hearing"); see also *McIlwain v. State*, 287 Ga. 115, 118 (2010) (Attorney "could not be ineffective for failing to . . . call a potential alibi witness of whom she was not informed."). Because Fripp has failed to present the testimony of any such alibi witness that would have been favorable to his defense, we conclude that Fripp has not shown that the failure to call an alibi witness prejudiced him. See *Palmer*, 310 Ga. at 678

4. In Fripp's final enumeration of error, he contends that the court erred by giving a misleading jury instruction on coercion that was not tailored to the evidence presented at trial. At one point during Fripp's testimony about the threat Salter made while on their way to the police station, Fripp's counsel asked Fripp, "How would you characterize the demeanor or the way the person was looking at you or when y'all – were y'all –." The court interrupted and asked counsel to approach, and the following transpired at a

bench conference.

The court asked Fripp's counsel, "[I]s this some coercion defense?" and explained that "coercion is not a defense to murder." Fripp's counsel said he understood but explained that Fripp had gone into the police station out of fear. The court asked how this line of questioning was relevant since coercion was not a defense to murder. Fripp's counsel explained that it was relevant to why Fripp made the statement to law enforcement. The court replied, "Well, I've got to give a jury charge that coercion is not a defense to murder" but stated that it would allow the line of questioning for the limited purpose of explaining Fripp's conduct. Fripp's counsel explained: "[H]e's not using that to try to say that he was coerced at that scene and did something at the scene," but rather, only to say why he made a statement to police.

During the charge conference, the court asked the parties if it needed to instruct the jury regarding the coercion argument they discussed at the bench conference. The State requested a charge related to the bench conference and argued that coercion is not a

18

defense to murder. The court initially explained its intention to give the instruction, but after Fripp's counsel argued against it, the court acknowledged the concern in giving it. After taking a break, the court stated that it intended to give the coercion instruction from OCGA § 16-3-26.[2] Defense counsel objected on the basis that the charge was not tailored to the evidence presented, as there was no evidence that Fripp was coerced to commit any act other than to make a statement.

During the jury charge, the court instructed the jury, among other things, on the presumption of innocence, the credibility of witnesses, inconsistencies in a witness's pre-trial statements when compared to the witness's testimony at trial, the voluntariness of the defendant's statement, and the coercion defense under OCGA § 16-3-26.

---

[2] OCGA § 16-3-26 provides that:

A person is not guilty of a crime, except murder, if the act upon which the supposed criminal liability is based is performed under such coercion that the person reasonably believes that performing the act is the only way to prevent his imminent death or great bodily injury.

19

Fripp contends the coercion defense instruction the trial court gave was misleading because there was no evidence that Fripp was coerced to participate in the criminal conduct. This instruction, Fripp argues, could have confused the jury by suggesting that Fripp was trying to assert an affirmative defense of coercion, in contradiction to his theory of defense that he was not present at the time of the shooting. Finally, he contends that the court's instruction on the voluntariness of Fripp's statement increased the harm of the coercion instruction because a jury would believe the coercion instruction to be related to the committing of the crimes instead of the making of the statement to police.

Assuming without deciding that the trial court erred by giving this instruction, we conclude that any error was harmless. "Even when we find error in a jury charge, we will not reverse when the error is harmless, that is, when it is highly probable that the instruction did not contribute to the verdict." *Jones v. State*, 316 Ga. 481, 486 (2023). "To figure out whether an instructional error was harmless, we assess it in the context of the instructions as a whole."

20

Id. "And as with other trial errors, in assessing harm we review the record de novo, and we weigh the evidence as we would expect reasonable jurors to have done so." Id. (citation and punctuation omitted).

Under this standard, the question then becomes whether the court instructing the jury on the coercion defense was harmless. See *Jones*, 316 Ga. at 486. Here, it is highly probable that the instruction on the coercion defense did not contribute to the verdict given the strong evidence of Fripp's guilt and the totality of the instructions provided.

As to the evidence presented, the jury heard Fripp's own testimony that he was at the scene, at least shortly before the shooting occurred, Calvert's testimony that a man matching Fripp's description was still present at the scene during the shooting and pistol-whipped Calvert, and law enforcement's testimony that Fripp arrived at the police station the next day with the gun that was used to kill Ratcliff in the trunk of Fripp's red car—the same vehicle in which he arrived to the shooting scene. See *Jones*, 316 Ga. at 487

(any error in giving an instruction about evidence of other crimes was harmless where "the evidence against Jones was quite strong").

As to the other instructions given, Fripp argues that the harmful nature of the coercion instruction was worsened by the court's instruction on the voluntariness of the defendant's statement. He contends that the instruction went to the voluntariness of Fripp's statement, which thereby implied that the coercion instruction went to a different issue—whether Fripp was coerced into committing the murder—which was inconsistent with Fripp's contention at trial that he left the scene before the shooting occurred.[3] We disagree. When analyzed in "the context of the

_____

[3] The court instructed the jury:

> A statement that the Defendant allegedly made has been offered for your consideration. Before you may consider this as evidence for any purpose, you must determine whether the Defendant's statement was voluntary. To be voluntary, a statement must be freely and willingly given and without coercion, duress, threats, use of violence, fear of injury, or any suggestions or promises of leniency or reward. A statement induced by the slightest hope of benefit or the remotest fear of injury is not voluntary. To be voluntary, a statement must be the product of a free will and not under compulsion or any necessity imposed by others.

.

instructions as a whole," *Jones*, 316 Ga. at 486, the coercion defense instruction was harmless because Fripp did not assert that he was coerced into committing the murder and the jury was adequately instructed on other aspects for their deliberations.

The jury was instructed on, among other things, the presumption of innocence, the credibility of witnesses, inconsistencies in a witness's pre-trial statements when compared to the witness's testimony at trial, and the voluntariness of the defendant's statement. Regarding the voluntariness of the statement instruction, the jury was instructed to determine whether it believed that Fripp's statement was voluntarily given and, only then, could it consider the statement as evidence. Fripp does not challenge the correctness of the voluntariness charge, and "[i]t is presumed that the jury, which was under oath, followed the trial court's instructions unless there is clear evidence to the contrary." *Brooks v. State*, 309 Ga. 630, 636 (2020). Seeing no evidence that the jury did not follow the court's instruction to analyze whether the statement was voluntarily given before considering it as evidence or

23

any of the other proper instructions, we conclude that the voluntariness instruction did not make giving of the coercion defense instruction any more harmful and, thus, the coercion defense instruction was harmless. See *Jones*, 316 Ga. at 486.

Accordingly, when considered in the context of the jury instructions as a whole, the jury instructions clearly informed the jury of its duty to weigh the evidence presented at trial and make determinations as to credibility and voluntariness of statements, and it was highly probable that the coercion defense instruction did not contribute to the jury's verdict. See *Jones*, 316 Ga. at 486.

*Judgment affirmed. All the Justices concur, except Land, J., not participating.*