NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: October 15, 2025

S25A0650.  MOSS v. THE STATE.

PINSON, Justice.

Demarko Marquez Moss was convicted of malice murder and other crimes in connection with the shooting death of Keshia Smith.[1] On appeal, Moss contends that the trial court committed plain error

---

[1] Smith was killed on September 2, 2018. On November 30, 2018, a Fulton County grand jury indicted Moss for malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), felony murder predicated on possession of a firearm by a first offender probationer (Count 3), aggravated assault (Count 4), two counts of cruelty to children in the third degree (Counts 5 and 6), possession of a firearm during the commission of a felony (Count 7), and possession of a firearm by a first offender probationer (Count 8). Moss was tried by a jury from May 22 to 24, 2023. The jury found Moss not guilty of the two counts of cruelty to children, but guilty of all other counts. Moss was sentenced to life in prison without the possibility of parole for malice murder, 10 years in prison for possession of a firearm by a first offender probationer, and five years in prison for possession of a firearm during the commission of a felony, all to be served consecutively. The remaining counts merged for sentencing or were vacated by operation of law. Moss filed a timely motion for new trial, which he later amended through new counsel. The trial court held an evidentiary hearing on the motion for new trial, and denied the motion on November 4, 2024. Moss filed a timely notice of appeal. The case was docketed to the April 2025 term of this Court and submitted for a decision on the briefs.

by failing to instruct the jury that a confession cannot support a conviction unless it is corroborated; that the trial court erred by denying Moss's motion for a mistrial when the State improperly introduced evidence that Moss did not speak to a detective who tried to interview him; and that the trial court erred by admitting the testimony of an expert witness on domestic violence. He also contends that trial counsel provided constitutionally ineffective assistance by failing to request a jury instruction about confession corroboration, failing to contemporaneously move for a mistrial, failing to file a general demurrer to one count of the indictment, and failing to suppress evidence obtained under a search warrant for Moss's cell phone. Finally, Moss contends that he was prejudiced by the cumulative effect of these errors by trial counsel and by the trial court.

Those claims fail. Moss did not give a confession, so there was no need for a confession-corroboration jury instruction. Moss's motion for a mistrial was not preserved for appellate review because he did not make it contemporaneously. Any error in admitting the expert's testimony about domestic violence was harmless given the

2

non-specific nature of the testimony and the strong evidence of Moss's guilt. And Moss cannot show that he received ineffective assistance of counsel: Moss did not give a confession, so counsel was not deficient for failing to request a confession-corroboration jury instruction. Counsel made a strategic decision not to call attention to the testimony that alluded to Moss's not speaking to the police, so counsel did not perform deficiently by failing to contemporaneously move for a mistrial. It was not clear under existing precedent that a general demurrer would have succeeded, so counsel was not deficient for failing to file one. And it was not clear that the search warrant for Moss's phone did not satisfy the Fourth Amendment, so counsel was not deficient for failing to file a motion to suppress. Finally, because Moss has not shown that at least two errors occurred at his trial, he cannot show cumulative error. For these reasons, Moss's convictions are affirmed.

1. The evidence at trial showed the following. On the evening of September 2, 2018, Moss was playing video games with two of his brothers at the home of one of the brothers, Deondre Trammell. At

3

one point, Trammell went upstairs to use the bathroom and stayed there for a while, "scrolling through [his] phone." While he was in the bathroom, Trammell heard gunshots outside. He looked out the window, and saw Smith's car slowly rolling into another vehicle, and Moss driving away. Several minutes later, Trammell got a call from Moss. Moss said: "Damn, bro, what did I just do?" Phone records from Trammell's cell phone showed that Moss's phone called Trammell's phone four times between 10:08 p.m. and 10:10 p.m.

At 10:11 p.m., a neighbor called 911. Responding officers found a black car that had rolled into a parked truck. Slumped in the driver's seat of the black car was Smith, who had been shot multiple times at close range, and was pronounced dead at the scene. Two small children, aged about three and one, were sleeping in the back seat. The children were taken to a nearby fire department to wait for the Department of Family and Children Services.

Shortly after the killing, Moss's father came forward and told police that Moss may have been the shooter. Police followed up on that lead and interviewed Trammell and Moss's parents. Moss

4

turned himself in the next day.

Investigators got a search warrant for Moss's cell phone. The phone records revealed that Moss's phone had been texting with Smith's phone in the days before Smith was killed. Four days before the shooting, Moss's phone texted Smith's phone: "Let me see a pregnancy test[.] I put money to see that I think u been playing me from day one." Smith's phone responded: "Please leave me the f**k alone I do not have time for the s**t u sit at home and think about all day." Moss's phone texted back, "U lieing talking about u didn't know nothing," and Smith's phone responded, "I'm not finna keep dealing with this. U was wrong the first time kuz u 'thought' u knew what u was talking about and u wrong again[.] Goodbye."

The conversation resumed four days later, on the morning of the day Smith died. That morning, Moss's phone texted Smith's phone, "How u been doing [ ... ] Can we see eachother sometime out the day." This time, Smith's phone responded: "I need u to pay for me to get an abortion." Moss's phone replied: "OK when want me to get u the money." The phones stayed in communication through the

day. In the evening, Moss's phone texted, "U know how strong our bond is," and Smith's phone replied, "Not that strong like that anymore." Moss's phone texted, "I told u am make things work out," and Smith's phone responded, "Yea I guess[.] Idk how u gone fix what u did." Moss's phone then texted, "I apologize bae from my heart i do," and Smith's phone replied, "Yea." Finally, at 8:45 p.m., Smith's phone texted Moss, "I'm finna come by there to pick the money up." Moss's phone replied, "Ok." At 9:22 p.m., Smith's phone texted, "Here." One minute later — 48 minutes before the 911 call — Moss's phone responded, "okay, here I come."

The State introduced some evidence about domestic violence, some of which related to Smith. Smith's father testified that Smith called him a few days before her death to say that she had broken up with "some guy" and that she had "a problem" with him because he would not stop calling her. Similarly, Smith's aunt testified that Smith had said that, in her relationship, "she wasn't allowed to go anywhere" and "he had hit her." Neither the father nor the aunt

6

identified the person with whom Smith was in a relationship. Finally, the State called an expert on violence in intimate relationships, Rosa James. James had not reviewed this case and knew nothing about Moss or Smith specifically; rather, she testified generally about the dynamics of abusive relationships. James explained that many people who are in an abusive relationship are subjected to tactics and abuse — name-calling, isolation, threats, withholding money, and physical and sexual abuse — that the abuser uses to maintain power and control. James described the "cycle of abuse": while the tension is building, the victim is "walking on eggshells," waiting for something to happen; then the incident happens; then there is a period of reconciliation and "blaming and minimizing"; and finally, a "honeymoon phase" when everything is calm and the incident is forgotten. James used a demonstrative exhibit to help illustrate the "cycle of abuse." James also testified that victims of domestic violence return to their abusers an average of seven times before they finally leave the relationship.

2. Moss contends that the trial court should have instructed

the jury that under Georgia law, a confession alone, with no corroboration, "shall not justify a conviction." See OCGA § 24-8-823. In Moss's view, the instruction was required because his remark to his brother, "Damn, bro, what did I just do," was a confession.

Because Moss did not request a confession-corroboration jury instruction, our review is only for plain error. See OCGA § 24-1-103(d) ("Nothing in this Code section shall preclude a court from taking notice of plain errors affecting substantial rights although such errors were not brought to the attention of the court."); *Floyd v. State*, 321 Ga. 717, 722 (2025). To establish plain error, an appellant must show that the trial court committed an error that (1) was not affirmatively waived, (2) was clear and obvious and not subject to reasonable dispute, (3) affected the appellant's substantial rights, which usually means showing that it affected the outcome of trial, and (4) "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Floyd*, 321 Ga. at 722.

Moss's claim fails on the second part of the plain-error test. The trial court did not commit a clear and obvious error by failing to give

8

a confession-corroboration instruction, because Moss's remark to his brother was not clearly a confession. We have explained that a confession, for the purposes of the corroboration requirement of OCGA § 24-8-823, is an admission of guilt in which "the entire criminal act is confessed." *English v. State*, 300 Ga. 471, 474 (2017) (citation omitted). That makes a confession different from a mere incriminating admission, in which the accused admits to some incriminating circumstances but still denies ultimate responsibility for the crime by "putting forward exculpatory or legally justifying facts." See *Walker v. State*, 314 Ga. 390, 393 (2022) (citation omitted). Compare, e.g., id. at 392–93 (defendant's statement that he shot the victim but did so in self-defense was not a confession requiring corroboration), with *Hood v. State*, 311 Ga. 855, 858–59, 866 (2021) (defendant's statements to witnesses that he killed the victims, without adding any facts to mitigate or justify the act, were confessions requiring corroboration). An incriminating admission, unlike a confession, does not require corroboration under OCGA § 24-8-823. See *Walker*, 314 Ga. at 393. And here, Moss's remark — "Damn, bro, what did I

9

just do?" — was at most an incriminating admission. The remark does not confess to an entire crime, or even part of a crime.[2] Because this remark was not clearly a confession, the trial court did not commit a clear and obvious error by failing to give a confession-corroboration instruction, and this claim of plain error therefore fails.

3. Moss contends that the trial court should have granted his motion for a mistrial, which he made after a State witness made a comment that, in Moss's view, improperly referred to his right to remain silent. See *Whitaker v. State*, 283 Ga. 521, 524 (2008) ("[T]he fact that a defendant has exercised the right to remain silent is not to be used against the defendant at trial.").

(a) Before trial, the State moved in limine to exclude any information about Moss's mental health. The record shows that Moss had

---

[2] Moss points out that the State referred to his remark several times in its closing argument and suggested that it was a confession. But a closing argument is neither evidence nor legal instruction, and the State has wide latitude when presenting its closing to characterize the evidence and to draw inferences. See *Arnold v. State*, 309 Ga. 573, 577 (2020) ("A prosecutor is granted wide latitude in the conduct of closing argument …. Within that wide latitude, a prosecutor may comment upon and draw deductions from the evidence presented to the jury.") (cleaned up); *Gates v. State*, 298 Ga. 324, 328 (2016) (closing arguments are not evidence). It is entirely appropriate for the State to make use of the defendant's incriminating admissions in its closing argument.

10

behaved unusually when he turned himself in to police — he was not speaking to anyone and was "shaking his body as if he had no control" — and as a result he was given a psychiatric evaluation. But that evaluation concluded that Moss was fabricating his symptoms, and Moss was later found to be competent to stand trial. On the first day of trial, Moss agreed to the State's motion to exclude references to Moss's mental health. Moss suggested, however, that the State might open the door to the subject if it introduced evidence about Moss's "behavior" during his arrest. The trial court said that the State was "now on notice for that," and granted the motion in limine to exclude information about Moss's mental health.

At trial, the lead investigator, Detective Tasha Armand, testified that after she received the tip that Moss may have shot Smith, she interviewed members of Moss's family. Then she added: "And I attempted to interview Demarko Moss." The State asked, "And the person that you attempted to interview, do you have their name?" The detective repeated, "Demarko Moss."

Moss did not immediately object to this statement from the detective. But after the detective finished her direct testimony, counsel asked for the jury to be excused, and then, once the jury was out of the courtroom, he moved for a mistrial. He explained that he had "thought about" objecting right when the detective said she "attempted" to interview Moss, but that, on "further contemplation," he had decided not to "draw attention" to the detective's remark. (At the motion-for-new-trial hearing, counsel testified that he had no strategic reason for not making a timely objection.) On the merits, counsel at trial argued that a mistrial was necessary because the jury did not know why Moss was not interviewed at the time of his arrest — that is, that he was thought to be mentally unstable — and that the jury might thus conclude, improperly, that Moss had invoked his right to counsel or to remain silent.

The trial court denied the motion for mistrial. The court noted that defense counsel had not made a contemporaneous objection to the detective's testimony. And the court found that the detective's

testimony, "while it went right up to the line," did not actually comment on Moss's mental health or his invocation of any rights, and did not "connect[ ] the dots" of why he was not interviewed. The court concluded there was no "manifest necessity" for a mistrial.

(b) Moss's claim that the trial court abused its discretion by denying his motion for a mistrial is not preserved for appeal because Moss did not move for a mistrial "at the earliest opportunity in the trial court." See *Bates v. State*, 317 Ga. 809, 818 (2023) (explaining how a mistrial motion is preserved). To preserve his mistrial motion for appellate review, Moss needed to make a "contemporaneous motion … at the time [he] became aware of the matter giving rise to the motion." *Thomas v. State*, 310 Ga. 579, 581 (2020). Here, that would have been the moment when Detective Armand testified that she "attempted" to interview Moss. But counsel waited for the detective to finish her testimony before moving for a mistrial. Because the motion was not contemporaneous, the claim is not preserved for appellate review. See *Bates*, 317 Ga. at 818; *Thomas*, 310 Ga. at 581–82.

13

4. Next, Moss contends that the trial court should not have allowed the State's expert on domestic violence, Rosa James, to testify. At trial, Moss objected that James's testimony was not relevant because she had no knowledge of this specific case, but the trial court overruled that objection. On appeal, Moss makes the same argument about relevance, relying on OCGA § 24-4-401 (Rule 401) and OCGA § 24-7-702 (Rule 702).

Assuming without deciding that the trial court abused its discretion by allowing James to testify, the error was harmless. A non-constitutional evidentiary error is harmless if it is "highly probable that the error did not contribute to the verdict." *Smith v. State*, 313 Ga. 584, 587 (2022). When we assess whether an error was harmless, "we review the record de novo and weigh the evidence as we would expect reasonable jurors to have weighed it." *Johnson v. State*, 316 Ga. 672, 684 (2023).

Applying that standard, it is highly probable that James's testimony did not contribute to the verdict. To begin with, the evidence of Moss's guilt was quite strong. Trammell testified that when he

heard gunshots and looked out the window, he saw Moss driving away and Smith's car rolling into a third vehicle. Smith's body was found in her car soon afterward. A few minutes after that, Moss called Trammell and said, "Damn, bro, what did I just do?" And other evidence cast  Moss and Smith's relationship in a negative light. Members of Smith's family testified that she had recently broken up with, or was trying to break up with, a man who was controlling, who "hit" her, and who would not leave her alone. Although the family members did not identify the man, the text message conversation between Moss's phone and Smith's phone supported an inference that the man was Moss. Among other things, those messages showed that Moss accused Smith of faking a pregnancy, Smith explicitly told Moss to leave her alone, and then Smith asked for money to pay for an abortion. And Smith was shot when she arrived to collect that money from Moss. Combined with the testimony from Smith's family, the messages between Smith's phone and Moss's phone showed that the relationship between the two was at least tumultuous.

Compared to that strong evidence of guilt, James's testimony was highly unlikely to have contributed to the verdict. James discussed some general principles about domestic violence and abusive relationships, but she did not testify about Moss specifically or refer to any facts of this case. To the contrary, she testified that she had not reviewed the police reports or any evidence in the case. And although her testimony may have underscored the theme of domestic violence for the jury, the jury had already heard evidence that Smith may have been in an abusive relationship with Moss, so James's testimony was not the only evidence of that kind.

In short, James's testimony was not especially prejudicial to Moss, and given the strong evidence of his guilt, it was highly probable that any error in admitting the expert's testimony did not contribute to the verdict. See, e.g., *Mack v. State*, __ Ga. __, S25A0773, slip op. at 12–13 (Aug. 26, 2025) (testimony of expert witness was harmless when it was partly cumulative of other evidence and the overall evidence of guilt was strong). See also *Johnson v. State*, 316 Ga. 672, 684 (2023) (error in admitting graphic pre-autopsy photos

was harmless where evidence of guilt was strong and other properly admitted photos were even more graphic).[3]

5. Moss also contends that his trial counsel was constitutionally ineffective in a number of ways. To prevail on a claim on ineffective counsel, an appellant must show both that counsel's performance was professionally deficient and that he suffered prejudice as a result. See *Strickland v. Washington*, 466 US 668, 687 (1984); *Washington v. State*, 313 Ga. 771, 773 (2022). To show deficiency, the appellant must show that his lawyer performed "in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms." *Heyward v. State*, 319 Ga. 588, 592 (2024). That means the defendant must "overcome the strong presumption that counsel's performance fell within a wide range of reasonable professional conduct." *McIver v. State*, 321 Ga.

---

[3] Moss's enumeration of error and section heading also contend that the trial court should not have admitted James's demonstrative exhibit illustrating the cycle of abuse. But Moss makes no separate argument about the exhibit, so that contention is abandoned. See Ga. Sup. Ct. R. 22 (1) ("Any enumerated error or subpart of an enumerated error not supported by argument, citations to authority, and citations to the record shall be deemed abandoned.").

565, 569 (2025). To overcome that presumption, the defendant must show that "no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not." *Evans v. State*, 315 Ga. 607, 611 (2023) (quotation omitted). To show prejudice, the appellant must show that, but for counsel's deficient performance, there was a "reasonable probability" that the result of the trial would have been different. *Heyward*, 319 Ga. at 592 (quotation marks omitted).

(a) Moss first contends that his counsel was ineffective for not requesting a jury instruction about confession corroboration. That claim fails because Moss cannot show that his counsel performed deficiently. As explained in Division 2, Moss's remark to his brother was not clearly a confession, so counsel could reasonably conclude that there was no basis for a confession-corroboration instruction. Moss has therefore not shown that any reasonable lawyer would have requested the instruction that his lawyer did not request. See *Evans*, 315 Ga. at 611. See also *Whittaker v. State*, 317 Ga. 127, 137 (2023) (counsel does not perform deficiently by failing to request a

jury instruction that is not supported by the evidence).

(b) Next, Moss contends that his counsel was constitutionally ineffective by not moving for a mistrial contemporaneously — that is, right when Detective Armand testified that she "attempted" to interview Moss — and thus preserving the mistrial motion for appellate review.

That claim also fails because Moss cannot show that his counsel performed deficiently. Moss's counsel articulated a strategic reason for not objecting to the detective's remark about "attempt[ing] to interview" Moss: he did not want to "draw attention" to the remark. An attorney's strategic decisions at trial can serve as the basis for an ineffectiveness claim only if they are "so patently unreasonable that no competent attorney would have made such a decision," *Clark v. State*, 321 Ga. 732, 738 (2025) (quotation marks omitted), and counsel's decision here does not meet that threshold. A strategic decision not to draw attention to testimony or argument by making a contemporaneous objection or mistrial motion generally falls within the range of reasonable professional conduct. See, e.g., *Lay v. State*,

305 Ga. 715, 720 (2019) (counsel reasonably could have chosen not to object to a brief comment during testimony about the defendant's invocation of his right to remain silent so as not to draw attention to it); *Atkinson v. State*, 301 Ga. 518, 527 (2017) (counsel reasonably decided not to object to a comment about the defendant smoking marijuana because "she did not find it to be important enough to draw attention to it"). Just so here, especially because, as the trial court explained, the detective's remark did not "connect[ ] the dots" — did not say explicitly — that Moss had invoked his right to remain silent. See *Whitaker*, 283 Ga. at 524 (explaining that some remarks about a defendant's silence are less prejudicial and do not require a mistrial or reversal on appeal). Given the relatively benign nature of the detective's remark, it was not "objectively unreasonable" for counsel to decide not to draw attention to it, and so this claim of error fails. See *Heyward*, 319 Ga. at 592 (quotation marks omitted).

(c) Moss also contends that his counsel was ineffective for failing to file a general demurrer to Count 8 of the indictment. Count 8

charged Moss with "the offense of possession of firearm by first offender probationer O.C.G.A. § 16-11-131(b)," and alleged that Moss, "on the 2nd day of September, 2018, did knowingly and without lawful authority possess a firearm; accused having been sentenced ... to a term of probation as a Felony First Offender on December 5, 2017."

A general demurrer challenges the sufficiency of the substance of an indictment. See *Powell v. State*, 318 Ga. 875, 880 (2024). The general demurrer must be granted if the indictment fails to either (1) "recite the language of the statute that sets out all the elements of the offense charged" or (2) "allege the facts necessary to establish a violation of a criminal statute." Id. (cleaned up) (citing *State v. Mondor*, 306 Ga. 338, 341 (2019)). Put another way, a general demurrer will be granted if the defendant "can admit each and every fact alleged in the indictment and still be innocent of any crime." Id. (quoting *State v. Williams*, 306 Ga. 50, 52–53 (2019)). Because granting a general demurrer results in dismissal of the charges, an attorney who fails to file a meritorious general demurrer may be held constitutionally ineffective. See *State v. Heath*, 308 Ga. 836, 841–42

(2020).

Moss contends that Count 8 here would not have survived a general demurrer because it failed to allege one essential element of the charged offense: that Moss was on probation at the time he possessed a firearm. See OCGA § 16-11-131(b) ("Any person who is *on probation* as a felony first offender ... and who receives, possesses, or transports a firearm commits a felony") (emphasis added); *Chavez v. State*, 307 Ga. 804, 808 (2020) (reversing a conviction for possession of a firearm as a first-offender probationer when "the State presented no evidence that [the defendant] possessed a firearm during the term of his probation and prior to his discharge"). We are not so sure. In Moss's view, Count 8 did not allege that essential element because the only facts that it alleged were that (1) Moss was sentenced to probation on December 5, 2017, and (2) Moss possessed a firearm on September 2, 2018. Moss is correct that he could admit to both of those facts and still be innocent of the charged crime: the probation that was imposed on December 5, 2017 could have ended

22

before September 2, 2018. But as the State points out, the State labeled the offense that Moss was charged with in the indictment as "possession of a firearm by first offender probationer," which includes the word "probationer," which means someone on probation. And Moss obviously could not admit to possessing a firearm as a "probationer" and still be innocent of that charge. So in sum, Count 8 could have withstood a general demurrer only if the name of the offense being charged can be read as a factual allegation.

We are not aware of any precedent resolving the question whether the State's chosen name for an offense being charged in an indictment may be read as a factual allegation. Although we have held that indictments are to be read as a whole, see, e.g., *Powell*, 318 Ga. at 882, Moss has not pointed to any authority holding that that rule means we treat the name of the charged offense as a factual allegation. On the other hand, we also have not held that the name of the offense *cannot* be counted among the factual allegations of an indictment. In short, existing precedent does not establish whether Count 8 would have survived a general demurrer.

That uncertainty forecloses Moss's ineffective-counsel claim. If "existing precedent" at the time did not make clear that a legal argument would have supported a demurrer, then a defendant "cannot show that trial counsel's failure to file a demurrer asserting that argument amounted to deficient performance." *State v. Riley*, 321 Ga. 323, 328 (2025) (quotation marks omitted). And speaking more generally, counsel usually will not be deficient for failing to advance a legal theory that would require "an extension of existing precedents and the adoption of an unproven theory of law." *Esprit v. State*, 305 Ga. 429, 438 (2019) (quotation marks omitted). See also *Walker v. State*, 306 Ga. 579, 583 (2019) ("[T]here is no general duty on the part of defense counsel to anticipate changes in the law.") (citation omitted). Here, a general demurrer to Count 8 necessarily would have relied on the unproven legal theory that the name of a charged offense cannot be counted among the factual allegations of the indictment. Because Count 8 was not unambiguously defective under existing law, it was not deficient for counsel not to file a general demurrer, and so this claim fails. See *Riley*, 321 Ga. at 327 (counsel

24

was not ineffective for failing to file general demurrer to a charging document that was "not unambiguously an indictment" but that contained certain indications that it was).

(d) Moss finally contends that counsel was ineffective for failing to move to suppress the evidence obtained under the search warrant for his cell phone. The warrant included the following description of the items to be seized:

> Information stored in the phone to include outgoing and incoming calls, voice mails, text messages, address book, photos, sim card information, and other information on the device that may be used during the investigation for Murder (O.C.G.A. 16-5-1) Possession of Firearm During Commission of Certain Crimes (O.C.G.A. 16-11-106), and Cruelty to Children in the Third Degree (O.C.G.A. 16-5-70).

In Moss's view, that description did not satisfy the particularity requirement of the Fourth Amendment to the United States Constitution, which states that a search warrant must "particularly describ[e] the place to be searched, and the persons or things to be seized."

When we evaluate a claim that counsel was deficient for failing to file a motion to suppress, we ask whether "a motion to suppress

25

on the specific basis proposed by the appellant would clearly have succeeded" if counsel had raised it. *Pugh v. State*, 318 Ga. 706, 720 (2024) (quotation marks omitted). See also *Ward v. State*, 313 Ga. 265, 275 (2022). That "basis" here is that the warrant was not particularized. In that regard, a warrant will generally satisfy the particularity requirement if it gives officers "enough guidance to locate and seize only those items the warrant authorizes" and is "as specific as the circumstances and nature of activity under investigation permit." *Jones v. State*, 321 Ga. 137, 148 (2025). By contrast, a warrant that authorizes a "general search" — a "general, exploratory rummaging in a person's belongings" — does not satisfy the particularity requirement, and is unconstitutional. *State v. Wilson*, 315 Ga. 613, 614–15 (2023) (quoting *Coolidge v. New Hampshire*, 403 US 443, 467 (1971)).

Moss's claim of ineffective assistance fails because a motion to suppress evidence obtained under the search warrant based on lack of particularity would not clearly have succeeded. Some elements were problematic when combined: it did not limit the date range that

26

officers could search, and it included a "catch-all" provision that allowed officers to seize "other information on the device" beyond the communications-related data (text messages, phone calls, photos, voicemails, the address book, and sim card information) tied most closely to the basis for probable cause — i.e., that police had learned that Smith had been texting with Moss immediately before she arrived at the location where she was shot to death. But those issues do not clearly invalidate the warrant. In light of the list of communications-focused data, the catch-all clause may be reasonably construed to refer to other data of a similar nature, see, e.g., *Reaves v. State*, 284 Ga. 181, 186 (2008) (search warrant's residual "catch-all" phrase "must be read in light of the items that precede it"; residual clause did not authorize a general search when it was "specifically limited … to the crime under investigation" and came "at the end of a list of specific items which also provided guidelines for the officers conducting the search") (cleaned up), rather than as permitting a wholesale seizure of any and all information on the phone for any and all purposes. And we are aware of no precedent — and Moss

cites none — supporting the notion that an unlimited date range, either alone or combined with a catch-all clause that is limited like the one here, is enough to nudge an otherwise valid warrant outside the bounds of the particularity requirement.

Moss relies on our decision in *Wilson*, where we held that a search warrant was not particularized when it authorized the seizure of "any and all stored information" on the defendant's cell phones, without placing any limit on either the date or the type of information to be seized. See *Wilson*, 315 Ga. at 613, 616. But again, the warrant here was not so unlimited, at least not clearly so. It listed only certain communications-related categories of data — as opposed to "any and all stored information" — and it tied them to the investigation of specific crimes. In that respect, the closer comparison is to the search warrant that we upheld in *Pugh*, which, "paint[ed] a broad stroke" in places, but also listed specific categories of items to be seized and limited some of those categories "by time or by reference to the specific crime under investigation." *Pugh*, 318 Ga. at 722. In *Pugh*, we held that the warrant there, so limited, was

"not as easily read as the warrant in *Wilson* as authorizing the seizure of all data without limitation on the target cell phone." Id. The same can be said of the warrant here.

To put it simply, a reasonable lawyer could look at the search warrant in this case and conclude that it satisfied the Fourth Amendment, or at least that a motion to suppress asserting the contrary claim would not clearly succeed. See *Pugh*, 318 Ga. at 720. Because Moss cannot show that "no reasonable lawyer" would have failed to move to suppress evidence obtained under the warrant, this claim of error fails. See *Evans*, 315 Ga. at 611.

6. Finally, Moss contends that the cumulative effect of the errors at his trial requires his convictions to be reversed. But to establish cumulative error, Moss must show that "at least two errors were committed in the course of the trial," and that, considered together along with the entire record, the errors "so infected the jury's deliberation that they denied [him] a fundamentally fair trial." *Perrault v. State*, 316 Ga. 241, 248 (2023) (quotation marks omitted). And Moss has not made that showing because we have assumed only one

error by the trial court — admitting the expert testimony of Rosa James — and concluded that trial counsel did not perform deficiently in any of the ways that Moss contends. Because Moss cannot show that at least two errors occurred, there is "no basis for evaluating the cumulative effect of errors," and so this claim fails. See *Kirkland v. State*, 318 Ga. 639, 658 (2024).

*Judgment affirmed. All the Justices concur.*